**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **RONALD ALLEN** | |
| **Plaintiff,** | |
| | **CIVIL ACTION NO:** |
| **v.** | |
| **GEORGIA DEPARTMENT OF CORRECTIONS;** | **JURY TRIAL DEMAND** |
| **TYRONE OLIVER, individually;** | |
| **JACK "RANDY" SAULS, individually;** | |
| **DR. MARIAH MARDIS, individually;** | |
| **SHAWN EMMONS, individually;** | |
| **LACHESHA SMITH, individually;** | |
| **RENITA STRICKLAND, individually;** | |
| **NETA ROBY, individually;** | |
| **DR. LATONYA JAMES, individually;** | |
| **STEVEN FINDERSON, individually;** | |
| **SHELIA SMITH, individually;** | |
| **KAMALA WALLER, individually;** | |
| **and JOHN DOES 1-5** | |
| **Defendants.** | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, **RONALD ALLEN**, and files this, his Complaint for Damages

pursuant to the Georgia Tort Claims Act ("GTCA"), O.C.G.A. § 50-21-20, et seq., and 42 U.S.C. §

1983, and shows this Honorable Court the following:

### INTRODUCTION

The treatment of Plaintiff Ronald Allen, a former inmate at the Georgia Diagnostic and

Classification State Prison (hereinafter referred to as "GDCP" and/or "the Prison"), detailed

below in this Complaint, is, unfortunately, not an isolated incident of a Georgia Department of

Corrections (hereinafter "GDC") inmate being injured. His treatment reflects the norm in Georgia's correctional system, which currently incarcerates nearly 50,000 people across 35 state-run prisons and 4 private facilities, while remaining chronically underfunded, notoriously nontransparent, and unaccountable for unconstitutional conditions and treatment. This has fostered a culture of deliberate indifference to these unsafe conditions.

In January 2024, the *Atlanta Journal-Constitution* reported that the Georgia Department of Corrections was operating with nearly half of all corrections-officer positions vacant, a crisis explicitly acknowledged by Commissioner Tyrone Oliver during budget hearings before the Georgia General Assembly.[1] These long-standing vacancies, which have existed for years, have caused institutions to operate with dangerous understaffing and an inability to ensure basic security, supervision, or safety for incarcerated individuals. The article also highlighted that working conditions inside Georgia prisons are now considered "the hardest job in law enforcement," citing increased violence, the presence of gang members, rising contraband, and severe mental health and chronic illness caseloads among inmates.

The GDC has faced major legal scrutiny due to its long-standing, systemic failure to provide minimally constitutional conditions of confinement. In April 2024, after nearly a decade of documented violations, the United States District Court for the Middle District of Georgia issued a detailed 100-page contempt order outlining how GDC officials repeatedly

---

[1] Maya T. Prabhu, *Nearly Half of Georgia Corrections Officers' Positions Vacant*, ATLANTA J.-CONST. (Jan. 18, 2024).

ignored federal court mandates designed to protect incarcerated individuals from inhumane, unsafe, and medically hazardous conditions. The Court's findings reveal a correctional system where basic human needs, such as adequate clothing, protection from extreme temperatures, sanitation, and access to medical evaluation, were not only neglected but actively and intentionally withheld.

Judge Marc Treadwell found by clear and convincing evidence that GDC routinely placed men in "strip" or "observation" cells where they were deprived of all clothing, bedding, and essential protective items, leaving them exposed to freezing temperatures, unsanitary environments, and prolonged periods of physical and psychological distress. Inmates reported being left naked or nearly naked in cells contaminated with trash, mold, and feces, with nonfunctioning toilets and no heat or ventilation. These findings were corroborated by internal GDC audits that described the conditions as "filthy," rife with mold, lacking ventilation, and plagued by broken infrastructure, including broken showers, missing plexiglass, and blackened floors, as well as testimony documenting "freezing" conditions and the absence of required protective clothing.

Equally concerning, the Court pointed out systemic failures in providing medical care. Essential medical and mental health assessments were frequently canceled for weeks or months due to chronic understaffing, and records of these evaluations were either missing, falsified, or never made. Inmates placed in "observation" cells, supposedly for medical or mental health reasons, were found to lack the necessary medical documentation, confirming that medically vulnerable individuals were left in conditions that increased the risks of injury, infection, and long-term harm.

These court findings confirm that GDC officials knew about serious environmental hazards, the widespread lack of protective gear, and ongoing failures to provide timely medical care, yet deliberately chose not to address these unconstitutional practices. The GDC's pattern of ignoring rules, hiding issues, falsifying records, and failing to provide necessary protections reflects a correctional system that openly disrespects constitutional standards.

On October 1, 2024, the United States Department of Justice (hereinafter "DOJ") released a harsh report about Georgia's Prisons. After years of investigation, the DOJ found reasonable cause to believe that Georgia is violating the Eighth Amendment by failing to protect incarcerated individuals from severe violence, widespread sexual abuse, and consistently unsafe conditions.[2] These findings verify that GDC runs prisons in a state of crisis, with incarcerated men facing conditions so dangerous and chaotic that federal investigators described violence as "near-constant" and the physical environment as fundamentally insecure.

The DOJ found that Georgia's prisons experience levels of violence far exceeding national norms. Between 2018 and 2023 alone, GDC reported 142 homicides, numbers the DOJ found to be understated due to chronic misclassification and investigative failures. In multiple facilities, prisoners are left entirely unsupervised for long stretches due to staffing vacancy rates exceeding 60–70%. GDC's own audits and the DOJ's site inspections revealed that entire dorms and even whole buildings often operate without a single officer present,

---

[2] U.S. Dep't of Justice, Civil Rights Div., *Findings Report: Investigation of Georgia Prisons* (Oct. 1, 2024)

leaving incarcerated individuals trapped in a system described as "lawless," where gangs dictate housing, extort individuals and their families, and control movement within the prison.

The DOJ also determined that medical and emergency response systems have failed. Due to severe understaffing, emergency medical teams are often delayed 30 minutes or more at the gates, and multiple deaths were only discovered after rigor mortis had set in, showing that individuals were left unattended for hours. These systemic failures, along with falsified or incomplete incident records, widespread underreporting of violence, and the near-total collapse of internal investigations, reveal an agency operating with deliberate indifference to the safety and lives of the people in its custody.

The DOJ's report confirms that the dangers Allen faced, including exposure to extreme environmental hazards, lack of supervision, the inability to summon medical help, and foreseeable serious physical injuries, are not isolated or accidental. Instead, they are the predictable result of a correctional system that the federal government has deemed unconstitutional in nearly every aspect of its operation.

In January 2025, *The Atlanta Journal-Constitution* reported that Governor Brian Kemp publicly acknowledged the existence of a statewide prison crisis after years of denying or minimizing the system's failures.[3] At a rare pre-session appropriations meeting, Commissioner Tyrone Oliver presented the plan to lawmakers, who acknowledged that the crisis was so severe that extraordinary measures were required. Legislators noted that the

---

[3] Carrie Teegardin & Danny Robbins, *Lawmakers, Kemp Acknowledge Prison Crisis, Consider Millions in Fixes*, ATLANTA J.-CONST. (Jan. 7, 2025).

situation had been "studied and studied" and that the state had reached a point where "it's time to get something done," underscoring that GDC's collapse was longstanding and well-documented

In February 2026, *The Atlanta Journal-Constitution* reported that U.S. District Court Judge Tilman E. "Tripp" Self III publicly admonished the Georgia Department of Corrections ("GDC") and Commissioner Tyrone Oliver for repeatedly ignoring federal court orders.[4] At a hearing in the Middle District of Georgia, Judge Self expressed doubt about whether GDC saw itself as "above the law," even summoning Commissioner Oliver to the witness stand to explain the department's noncompliance. The judge told Oliver directly, "how little credibility the Department of Corrections has," describing GDC's disregard of an order from the Eleventh Circuit Court of Appeals as "shocking" and "unbelievable." Judge Self pointed out that if this were "a child-support case," Oliver "would be in jail." These findings show that GDC leadership, including Defendant Oliver, was repeatedly warned about federal court orders, ongoing violations, and systemic constitutional failures—yet continued to dismiss judicial authority and inmate rights.

The fact that Mr. Allen is alive to pursue this suit is the only thing that sets him apart from many others. In simple terms, negligent actions and failures to act by the Georgia Department of Corrections and its officials caused Ronald Allen to work with frozen food without any protective gear, leading to severe injuries to both hands. These injuries were

---

[4] Joe Kovac Jr., *Federal Judge Chides Georgia Prison Boss and GDC for Acting 'Above the Law'*, ATLANTA J.-CONST. (Feb. 2026).

worsened by inadequate medical treatment despite ongoing complaints and visible signs that his condition was deteriorating. This negligence establishes liability under the Georgia Tort Claims Act. Moreover, the individual defendants' failures to act in specific situations, as described below, amount to deliberate indifference to a serious risk of harm, violating the Eighth Amendment to the U.S. Constitution. In certain cases, it is clear that the individual defendants acted intentionally to harm Mr. Allen, violating the Fourteenth Amendment's Due Process Clause.

## PARTIES, VENUE, JURISDICTION, AND SERVICE

1.

Plaintiff, Ronald Allen ("Plaintiff" and/or "Allen"), is currently and at all times relevant to this action been a resident of Georgia.

2.

Defendant **Georgia Department of Corrections** ("GDC") is a state government entity of the State of Georgia, and pursuant to O.C.GA. § 50-21-35, Defendant GDC shall be served with process through its chief executive officer, Commissioner Tyrone Oliver, at Georgia Department of Corrections, Department Headquarters, 7 MLK Jr. Drive, Suite 543, Atlanta, Georgia 30334, and through the Director of Risk Management Services for the Georgia Department of Administrative Services, Wade Damron, at Risk Management Services, Georgia Department of Administrative Services, 200 Piedmont Avenue SE, Suite 1208, West Tower, Atlanta, Georgia 30334.

3.

Filed contemporaneously herewith as **Exhibit** A is a true and correct copy of the Notice of Claim which was presented within twelve (12) months of the occurrence that is the subject matter of this case in accordance with O.C.G.A. § 50-21-26.

4.

Filed contemporaneously herewith collectively as **Exhibit B**, are true, accurate, and complete copies of the original certified mail receipts for the Notices of Claim, identified above as Exhibit A, to the Commissioner of the Georgia Department of Corrections, Director of Risk Management Division for the Georgia Department of Administrative Services, and the Attorney General of Georgia.

This Complaint is being filed more than ninety (90) days after presentation of the Notice of Claim, during which no action has been taken with regard thereto by the Risk Management Division of the Department of Administrative Services, thereby permitting the filing of this action.

5.

Pursuant to O.C.G.A. § 50-21-35, filed contemporaneously herewith, is a Certificate of Compliance certifying that a copy of this Complaint has been mailed, this date, by Certified Mail, Return Receipt Requested, to the General Counsel for the State of Georgia at his usual address, which is: Christopher M. Carr, Attorney General, Office of the Attorney General of Georgia, 40 Capital Square, S.W., Atlanta, GA 30334.

Said affidavit is affixed hereto and incorporated and made a part hereof as **Exhibit C.**

6.

The Georgia Department of Corrections has not informed Plaintiff that any aspect of the notice of claim previously transmitted is deficient.

7.

Defendant **Tyrone Oliver** (hereinafter also referred to as "Commissioner Oliver" or "Defendant Oliver") was, at all times relevant to this action, Commissioner of the Georgia Department of Corrections, was acting under the color of state law, and was an employee, agent, and/or apparent agent of GDC. Defendant Oliver is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Oliver may be served with a summons and copy of this Complaint personally at his residence in Georgia, his office, to wit: Georgia Department of Corrections, 300 Patrol Road, Forsyth, GA 31029, or any location where he may be found in the State.

8.

Defendant **Jack "Randy" Sauls** ( Defendant "Sauls") is believed to have been the Assistant Commissioner of the Health Services Division of the Georgia Department of Corrections at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Sauls is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Sauls may be served with a summons and copy of this Complaint personally at his residence in Georgia, his office, to wit: Georgia Department of Corrections, 300 Patrol Road, Forsyth, GA 31029, or any location where he may be found in the State.

9.

Defendant **Dr. Mariah Mardis** ( Defendant "Mardis") is believed to have been the

Statewide Medical Director of the Health Services Division of the Georgia Department of

Corrections at the time of the incident, was at all times relevant acting under color of state

law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald

Allen's health and safety. Defendant Mardis is a resident of the State of Georgia and is subject

to the jurisdiction of this Court. Defendant Mardis may be served with a summons and copy of

this Complaint personally at her residence in Georgia, her office, to wit: Georgia Department of

Corrections, 300 Patrol Road, Forsyth, GA 31029, or any location where she may be found in

the State.

10.

Defendant **Shawn Emmons** (Defendant "Emmons") is believed to have been the

Warden of the Georgia Diagnostic and Classification State Prison at the time of the incident,

was at all times relevant acting under color of state law, was an employee, agent, and or

apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant

Emmons is a resident of the State of Georgia and is subject to the jurisdiction of this Court.

Defendant Emmons may be served with a summons and copy of this Complaint personally at

his residence in Georgia, his office, to wit: Georgia Department of Corrections, 300 Patrol

Road, Forsyth, GA 31029, or any location where he may be found in the State.

11.

Defendant **LaChesha Smith** (Defendant "Smith") is believed to have been the Warden

of the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all

times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Smith is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Smith may be served with a summons and copy of this Complaint personally at her residence in Georgia, her office, to wit: Georgia Department of Corrections, 300 Patrol Road, Forsyth, GA 31029, or any location where she may be found in the State.

12.

Defendant **Renita Strickland** (Defendant "Strickland") is believed to have been a nurse practitioner working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Strickland is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Strickland may be served with a summons and copy of this Complaint personally at her residence in Georgia (believed to be 2143 Leafmore Court, Grayson, GA 30017) or any location where she may be found in the State.

13.

Defendant **Neta Roby** (Defendant "Roby") is believed to have been a nurse practitioner working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Roby is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Roby may be served with a summons and copy of this Complaint personally

at her residence in Georgia (believed to be 6143 Silver Spur Dr., Lithonia, Georgia 30058) or any location where she may be found in the State.

14.

Defendant **Dr. Latonya James** (Defendant "James") is believed to have been a medical doctor working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant James is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant James may be served with a summons and copy of this Complaint personally at her residence in Georgia (believed to be 2385 Stone Willow Way, Buford, Georgia 30519) or any location where she may be found in the State.

15.

Defendant **Steven Finderson** (Defendant "Finderson") is believed to have been a medical provider working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Finderson is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Finderson may be served with a summons and copy of this Complaint personally at his residence in Georgia (believed to be 8034 Stephanie Court, Jonesboro, Georgia, 30236) or any location where he may be found in the State.

16.

Defendant **Shelia Smith** (Defendant "Smith") is believed to have been a medical provider working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Smith is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Smith may be served with a summons and copy of this Complaint personally at her residence in Georgia (believed to be 506 Whistlestop Circle, Statesboro, Georgia 30461) or any location where she may be found in the State.

17.

Defendant **Kamala Waller** (Defendant "Waller") is believed to have been a medical provider working at the Georgia Diagnostic and Classification State Prison at the time of the incident, was at all times relevant acting under color of state law, was an employee, agent, and or apparent agent of GDC and was responsible for Ronald Allen's health and safety. Defendant Waller is a resident of the State of Georgia and is subject to the jurisdiction of this Court. Defendant Waller may be served with a summons and copy of this Complaint personally at her residence in Georgia (believed to be 7040 Duncan Walk, McDonough, Georgia 30252) or any location where she may be found in the State.

18.

Defendants, **JOHN DOES 1-5**, are other individuals, correctional officers, employees of the Georgia Diagnostic and Classification State Prison (GDC), or persons, corporations, or entities whose exact identities and addresses are currently unknown. Throughout all relevant

times related to this case, they acted under the color of state law and may have been agents, employees, or joint venturers of the above-named Defendants. They acted within the scope of their employment, agency, or joint venture during the relevant times and/or caused the harms and losses suffered by Ronald Allen.

19.

Defendants **JOHN DOES 1-5** may be liable for all or part of the deliberate and/or negligent acts or omissions committed that resulted in the Subject Incident, which caused injuries and damages to Ronald Allen, from whom the Plaintiff may seek recovery.

20.

The Defendants listed in the previous allegations and named as Defendants were all recorded in government records as officers on duty during the incident or in supervisory positions. These Defendants failed to take reasonable steps to ensure Ronald Allen's safety and proper medical treatment.

21.

All Defendants were entrusted with decision-making authority regarding inmate safety, the creation and/or implementation of customs, procedures, or policies, subordinate training and discipline, and the medical treatment of inmates, including Allen, and/or were directly involved in the circumstances that resulted in Allen's pain, suffering, and degradation.

22.

Jurisdiction for this action is based on 28 U.S.C. § 1331, concerning Plaintiff's claims that arise under the Eighth and/or Fourteenth Amendments of the U.S. Constitution and/or

laws, specifically 42 U.S.C. § 1983, to address the deprivation, under color of State Law , of the rights guaranteed to Ronald Allen by the U.S. Constitution.

23.

This Court also has supplemental jurisdiction over any State Law claims arising out of the same facts and circumstances, pursuant to 28 U.S.C. § 1367.

24.

Venue is proper pursuant to 28 U.S.C. § 1391 in the United States District Court for the Middle District of Georgia, where at all times relevant the acts of the Defendants occurred, giving rise to this cause of action, where Defendants reside, and or where the Defendants may be found and served in the Middle District of Georgia.

**FACTS**

25.

On January 11, 2024, Ron Allen begins his incarceration at GDCP.

26.

Shortly after his arrival, Allen was given a health assessment and physical by GDCP staff.

27.

Allen's blood pressure on January 11, 2024, was 179/81 with otherwise stable vital signs, and he was enrolled in the hypertension chronic illness clinic with labs and an EKG ordered.

28.

There is no record of the EKG on that date or any date thereafter.

29.

Allen's mental health screening was negative for suicidality, and his mental status was documented as stable

30.

Allen was cleared to work on any detail at the prison. He was assigned to the kitchen.

31.

As part of that assignment, Allen was expected to work with the frozen meat.

32.

At some point between April 1 and April 9, there was a minor riot at the prison.

33.

On the day of the riot, Allen was told that as part of this job detail, he needed to go into the freezer, grab cases of frozen meat, and separate the frozen beef patties so they could be cooked immediately to calm the prisoners.

34.

None of the meat was thawed; it was frozen solid.

35.

Allen asked GDC staff for protective gloves before beginning this job, and after much discussion, he was provided two (2) pairs of thin plastic food serving gloves to use.

36.

Despite his protests, Allen was forced to work with the frozen meat, separating the patties with only two pairs of transparent disposable food prep gloves.

37.

After spending almost two (2) hours with direct contact with the frozen meat, using both hands to separate the patties, Ronald Allen's fingers began to turn red and cause him intense pain.

38.

Allen complained about the pain to the guard on duty, and after seeing Allen's discolored fingers, the guard sent Allen directly to the medical office at the prison.

39.

No diagnostic tests were conducted on Allen on that date, nor was a doctor called or consulted. No records were created or maintained of this visit.

40.

On April 10, 2024, Allen told mental health that he was "stressed" and especially worried about his hands, saying he had submitted a health services request but had not received any follow-up medical care or treatment.

41.

On April 15, 2024, he submitted another Health Services Request stating that his hands were "starting to hurt badly," that he needed to see a doctor "ASAP."

42.

On April 18, 2024, Shelia Smith, LPN, documented a complaint of circulation problems in the fingers, with scabbed areas on the right index finger and left thumb, and referred Mr. Allen to a medical provider.

43.

On April 19, 2024, during a virtual provider appointment, Matthew Ewald (credentials unknown) documented bilateral distal extremity paresthesias of several weeks' duration. The provider considered possible neuropathy, ordered a hemoglobin A1c test, advised follow-up in one week, and prescribed naproxen.

44.

This virtual visit was required because no on-site medical provider was present on April 19, 2024.

45.

Between April 19 and April 28, 2024, Allen remained in intense pain, making numerous verbal requests for medical attention, which were all ignored.

46.

On April 29, 2024, Allen submits another health services request form, stating that both of his hands are in constant pain and are getting worse.

47.

Allen's requests were either ignored, not acknowledged, or not responded to.

48.

There was no hands-on medical evaluation by a provider between April 19 and May 7.

49.

On May 8, 2024, during a chronic care visit for hypertension with Defendant Renita Strickland, Allen reported worsening symptoms including swelling, discoloration, numbness,

tingling, severe fingertip pain rated 10/10, skin peeling, and pustular drainage around the nail beds.

51.

The May 8, 2024, examination documented bilateral distal hypopigmentation, erythema, edema, and tenderness in multiple digits, with a pre-existing deformity of the right index finger.

51.

Allen was diagnosed with bilateral hand pain, paresthesia, and paronychia, and was treated with ibuprofen and doxycycline, with instructions for elevation, warm soaks, and a scheduled one-week follow-up.

52.

On May 10, 2024, Allen expressed his concerns about his worsening hands to his mental health counselor, Kamala Waller. Allen said he doesn't understand why no one is trying to help him with his hands.

53.

There are no records showing that mental health staff ever relayed Allen's medical concerns to medical providers.

54.

On May 15, 2024, at a provider visit with Defendant Renita Strickland, Allen reported worsening pain, numbness, cold sensation, and purple discoloration of the thumb and first three fingers of both hands.

55.

Examination on May 15, 2024, revealed radial and brachial pulses present, but fingers 1–3 bilaterally were purple, cold, and very tender. The assessment raised concern for vascular or arterial occlusion, and after consulting with Defendant Dr. Latonya James, Mr. Allen was referred to Wellstar Spalding Emergency Department for evaluation.

56.

Defendant Dr. Latonya James never performed any hands-on examinations of Allen.

57.

On May 15, 2024, Allen was transported to Wellstar Spalding Emergency Department.

58.

Allen presented with a chief complaint of circulation problems and potential cold injury to his fingers, reporting about six weeks of discoloration and soreness in the right middle finger caused by work handling frozen foods in the kitchen. Examination showed ecchymosis and patchy dark areas with painful digits. Laboratory studies revealed moderate anemia and a mildly elevated C-reactive protein, with otherwise unremarkable results; no imaging was documented.

59.

The differential diagnosis included Raynaud's phenomenon, Achenbach's syndrome, and vasculitis, and Allen was ultimately diagnosed with Achenbach's syndrome. He was discharged the same day with ibuprofen, a short course of tramadol, and instructions for outpatient follow-up.

60.

Upon returning to GDCP that evening, Allen continued to report 10/10 bilateral hand pain and had significantly elevated blood pressure (up to 175/113). GDCP staff contacted Defendant Dr. Latonya James and received verbal orders: Clonidine 0.1 mg PO once for blood pressure, Toradol 60 mg IM once for pain, and ibuprofen 600 mg PO three times a day with food for 7 days for pain. Instructions were given for Allen to be seen by a physician the following morning, and with mental health.

61.

On May 16, 2024, Mr. Allen was examined by Defendant Physician's Assistant Steven Finderson. Allen continued to report severe bilateral hand pain, rated 10/10, with persistent swelling and discoloration of digits 1–3 in both hands.

62.

Defendant Finderson documented that the emergency department ruled out arterial occlusion and diagnosed Achenbach's syndrome, but upon examination, he noted ongoing swelling, discoloration, and significant tenderness of the affected digits. The plan included a single 60 mg IM dose of Toradol, Tramadol 50 mg twice daily (pending Dr. James's approval), and ibuprofen 600 mg three times daily for seven days to manage breakthrough pain.

63.

Over the next week, Allen continued to report severe hand pain.

64.

On May 20, 2024, Mayron Hayes, LPN, documented a treatment room visit for ongoing bilateral hand pain, noting that tramadol had still not been provided despite prior orders.

65.

On May 22, 2024, Defendant James ordered Tramadol 50 mg orally twice daily for 7 days, documented on the controlled substance form.

66.

On May 28, 2024, during a mental health visit, Allen reported to mental health staff that his hands had gotten worse and expressed explicit concern that "he is not getting the help he needs" and worried the facility would not provide adequate medical care due to his upcoming release.

67.

On May 31, 2024, Defendant Roby documented ongoing fingertip tenderness and discoloration, characterized the problem as a "cuticle injury/infection" related to handling ice with gloves, and treated with doxycycline, topical capsaicin, and adjustments to antihypertensive therapy.

68.

Hand X-rays were ordered, but there is no record of them ever being taken.

69.

On June 7, 2024, mental health records again documented that Allen appeared anxious, described his hands as looking "frost bitten," discolored, and swollen, and stated he had been told he had "freezer burn," yet no referral to medical was recorded.

70.

On June 10, 2024, Allen was released from custody. No documentation of discharge or release instructions for follow-up care and treatment of Allen's unresolved medical condition was provided.

71.

Around June 14, 2024, Allen went to Grady Hospital in Atlanta, Georgia, because of his hand condition. He started receiving extensive treatment, which included multiple surgeries, and has needed repeated hospital stays and ongoing follow-up care for his hand injuries.

72.

Allen has undergone continuous treatment and repeated hospitalizations since his release from GDCP.

73.

As recently as February 2025, Allen was required to undergo an amputation of his left hand as a result of the injuries sustained while at GDCP

74.

The images below show Allen's hands in January 2025 after the first surgeries were

performed at Grady



75.

The images below show Allen's hands in March 2025 after additional surgeries were performed at Grady.



76.

The images below show Allen's hands in August 2025 after additional surgeries were performed at Grady.



77.

The images below show Allen's hands in November 2025 after additional surgeries were performed at Grady.



78.

The images below show Allen's hands in February 2026 as his left hand continued to deteriorate.



79.

The named Defendants demonstrated a deliberate indifference to the

substantial and known risks of serious danger by not providing inmates with proper personal

protective equipment and inadequate medical attention.

80.

The conditions to which Allen was subjected were not isolated occurrences, but rather

customs and patterns of conduct, practices, and de facto policies that the United States

Department of Justice found had plagued GDC facilities for years, including at GDCP.

81.

The Defendants failed to protect their inmates, such as Allen, by failing to respond

reasonably to known risks, including staffing shortages, poor supervision, inadequate PPE,

and insufficient medical care.

82.

Those inadequacies were the foreseeable outcome of the Defendants' Administrative

Supervisory decisions, which allowed inmates to work on details without proper PPE and

resulted in woeful medical treatment due to chronic understaffing at GDCP and across GDC

facilities.

83.

Due to deficiencies known to the Defendants, including but not limited to, the

understaffing and failure to train staff, along with a lack of proper PPE, untimely and

inadequate medical care and attention to inmates in need, and their deliberate indifference,

resulted in Allen being exposed to extreme cold temperatures without PPE, sustaining

injuries, and receiving minimal medical attention despite the severity of his injuries, which

ultimately led to catastrophic damage to his hands.

84.

The Defendants were on actual notice at the time of Allen's worsening hand condition

and failed to provide the necessary medical care and treatment to ensure that Allen would not

suffer permanent harm.

85.

At all times between April 1 and May 15, 2024, the delay in providing physician-level

evaluation and appropriate vascular assessment caused the progressive worsening of Allen's

condition.

86.

Earlier intervention, including vascular imaging, warming protocols, or referral, could

have prevented or greatly reduced the tissue necrosis that ultimately required Ronald Allen to

undergo multiple surgeries and amputation.

87.

Attached hereto as **Exhibit D** and incorporated herein by reference for all purposes is

the affidavit and CV of Michael M. Neeki, DO, MS, FACEP, FAAEM, FSAME, CCHP-P, FACCP.

**COUNT I – 42 U.S.C. § 1983**
**DELIBERATE INDIFFERENCE TO SUBSTANTIAL RISK OF SERIOUS HARM**

88.

Plaintiff realleges all prior paragraphs.

89.

Defendants required Ronald Allen to perform work with frozen meat patties for multiple hours without adequate personal protective equipment.

90.

Ronald Allen expressly requested protective gloves prior to the assignment, providing actual notice of the hazard.

91.

Defendants knew of the significant danger of serious injury posed by having Ronald Allen handle frozen products without proper PPE and did not take reasonable steps to prevent harm.

92.

 PPE is required by the Georgia Board of Corrections regulations, including insulated gloves, as specified in Ga. Comp. R. & Regs. r. 125-3-5.04.

93.

Defendants failed to provide mandated PPE.

94.

Defendants failed to perform the hazard assessment required by 29 C.F.R. § 1910.132(d)(1).

95.

Defendants failed to communicate the PPE requirements as mandated by 29 C.F.R. § 1910.132(d)(1)(ii).

96.

Defendants failed to verify the assessment in writing as required by 29 C.F.R. § 1910.132(d)(2).

97.

Defendants failed to halt or remedy an unsafe work condition as required by Ga. Comp. R. & Regs. r. 125-3-5-.04(2).

98.

As a direct and proximate result of Defendants' conduct, Plaintiff suffered catastrophic injuries that he continues to suffer today.

99.

Defendants' failure to act despite knowledge of the risk constitutes deliberate indifference in violation of the Eighth and Fourteenth Amendments.

**COUNT II – 42 U.S.C. § 1983**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

100.

Plaintiff realleges all prior paragraphs.

101.

After his work-related cold exposure, Ronald Allen repeatedly sought medical attention for severe and worsening symptoms, including pain, discoloration, swelling, numbness, and visible tissue damage.

102.

Despite these repeated complaints and visible deterioration, Defendants ignored or dismissed his reports of worsening symptoms and failed to escalate his care to qualified medical providers.

103.

Georgia Board of Corrections rules require immediate removal from the work assignment, provision of first aid, and prompt medical transport (Ga. Comp. R. & Regs. r. 125-3-5-.03(4)).

104.

Defendants failed to follow this rule.

105.

The GDC has a statutory duty to provide clothing and necessary medical and hospital attention to inmates (O.C.G.A. § 42-5-2).

106.

Defendants failed in their statutory obligation to Ronald Allen.

107.

The National Commission on Correctional Health Care's (hereinafter "NCCHC") standard on Medical Surveillance of Inmate Workers (Standard B-04) sets the expectations for correctional facilities to maintain a medical surveillance program for inmate workers, ensuring that incarcerated individuals assigned to work roles are:

- Screened appropriately,

- Monitored for job-related health risks, and

- Protected through structured oversight mechanisms.

108.

Defendants failed to meet this standard.

109.

The American Correctional Association (hereinafter "ACA") establishes nationally recognized correctional standards to ensure safe, healthy, and well-managed prison operations by requiring facilities to identify and reduce workplace hazards for inmate workers.

110.

Defendants failed to meet these standards.

111.

Each Defendant had actual knowledge of Allen's worsening condition through direct observation, medical records, or staff reports, and each had the authority and ability to secure timely medical intervention but failed to do so.

112.

Defendants delayed or denied meaningful medical evaluation, failed to secure physician-level assessment when indicated, and failed to ensure that prescribed treatment and follow-up care occurred.

113.

As a direct and proximate result of Defendants' actions, Plaintiff's condition deteriorated over weeks, ultimately resulting in permanent injuries, including amputation.

114.

Defendants' conduct constitutes deliberate indifference to Ronald Allen's serious medical needs.

## COUNT III – 42 U.S.C. § 1983
### FAILURE TO INTERVENE

115.

Plaintiff realleges all prior paragraphs.

116.

Multiple Defendants personally observed Ronald Allen's visible hand injuries, heard his repeated complaints of increasing pain and discoloration, and knew he had been required to work with frozen meat patties without proper PPE.

117.

Defendants had actual knowledge of their duty to halt unsafe work and secure medical care under Ga. Comp. R. & Regs. r. 125-3-5-.03(4).

118.

Despite both a realistic opportunity and mandatory regulatory obligations to intervene, Defendants failed to act.

119.

Defendants knowingly allowed the dangerous condition to continue and knowingly allowed Plaintiff's worsening injury to go untreated for weeks.

120.

Each Defendant had actual knowledge of Allen's worsening condition through direct observation, medical records, or staff reports, and each had the authority and ability to secure timely medical intervention but failed to do so.

121.

Each Defendant had a realistic opportunity to intervene during the five-week period in which Allen repeatedly reported escalating symptoms, including purple discoloration, cold digits, drainage, and 10/10 pain.

122.

The risk to Ronald Allen was clear, ongoing, and repeatedly documented, yet no Defendant stopped the unsafe work assignment, increased care, or ensured adherence to mandatory medical-referral rules.

123.

Despite this knowledge, no Defendant made sure that Allen received a physician-level evaluation, diagnostic imaging, or emergency referral until May 15, more than five weeks after his initial injury.

124.

Defendants' inaction directly worsened Plaintiff's prolonged suffering, tissue damage, medical expenses, pharmaceutical costs, prosthetic fees, follow-up treatments, vocational training, occupational therapy, education, stump care, future surgical revisions, physiological injuries, systemic changes caused by the care and treatment of the injuries and conditions, and resulting permanent injuries.

125.

As a direct and proximate result of Defendants' failure to intervene, Plaintiff's

condition deteriorated over weeks, ultimately resulting in permanent injury, including

amputation, and he continues to suffer to date.

126.

Defendants' conduct constitutes a violation of Ronald Allen's rights under the Eighth

and Fourteenth Amendments.

### COUNT IV – 42 U.S.C. § 1983
### SUPERVISORY LIABILITY

127.

Plaintiff realleges all prior paragraphs.

128.

Supervisory Defendants were responsible for implementing and enforcing Georgia

Board of Corrections rules governing inmate work, PPE, and workplace safety, including

requirements under Ga. Comp. R. & Regs. r. 125-3-5-.04.

129.

Supervisory Defendants failed to implement, maintain, or enforce the mandated Safety

and Accident Prevention Program, despite clear evidence of unsafe work practices and actual

knowledge of inadequate PPE.

130.

The supervisory Defendants maintained policies, customs, and practices that resulted in the denial of PPE, the failure to conduct hazard assessments, and the chronic understaffing of medical units.

131.

These policies were longstanding, well-documented in internal audits, repeated newspaper exposés, and federal court orders, and were the moving force behind the constitutional violations Allen suffered.

132.

Supervisory Defendants failed to ensure compliance with NCCHC Standards, which require structured oversight, medical surveillance, and timely review of work-related injuries.

133.

Supervisory Defendants likewise failed to enforce ACA safety standards requiring identification and mitigation of workplace hazards.

134.

Supervisory Defendants were repeatedly notified of chronic understaffing, lack of PPE distribution, failures in medical follow-up, and the absence of meaningful safety oversight, but took no corrective action.

135.

These failures created and perpetuated a culture of deliberate indifference in which unsafe work conditions and inadequate medical care were the norm.

136.

Supervisory Defendants' failure to train, supervise, and correct known systemic

deficiencies was a moving force behind Ronald Allen's injuries.

137.

As a direct and proximate result of Defendants' conduct, Ronald Allen suffered

catastrophic and permanent harm, and he continues to suffer to date.

## COUNT V
## NEGLIGENCE UNDER THE GEORGIA TORT CLAIMS ACT

138.

Plaintiff realleges all prior paragraphs.

139.

The Georgia Department of Corrections had a duty to maintain reasonably safe inmate

work environments and to comply with safety regulations governing PPE, hazard mitigation,

and injury response.

140.

GDC breached this duty by failing to maintain the Safety and Accident Prevention

Program required by Ga. Comp. R. & Regs. r. 125-3-5-.04(6).

141.

GDC failed to ensure that inmates working with frozen products were provided with

insulated gloves or other required protective equipment.

142.

GDC failed to ensure timely medical evaluation and treatment despite repeated complaints and visible signs of injury.

143.

These failures constitute negligence under the Georgia Tort Claims Act.

144.

As a direct and proximate result of GDC's actions and inactions, Ronald Allen suffered severe and permanent injuries requiring multiple surgeries and ultimately amputation

145.

As an obvious and direct result of Defendants' conduct, Ronald Allen suffered, and continues to suffer.

146.

GDC is liable for Ronald Allen's damages under the GTCA.


**COUNT VI**
**ATTORNEYS' FEES UNDER O.C.G.A. § 13-6-11 and 42 U.S.C. § 1988**

147.

Plaintiff realleges all prior paragraphs.

148.

Plaintiff is entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiff caused unnecessary trouble and expense.

149.

Defendants' actions and omissions, taken under color of state law and in violation of 42 U.S.C. § 1983, have required Plaintiff to retain legal counsel to vindicate his constitutional rights.

150.

Plaintiff is therefore also entitled to recover his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988

## COUNT VII
## PUNITIVE DAMAGES

151.

By engaging in the above-described conduct, the individual Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Plaintiff to punitive damages pursuant to O.C.G.A. § 51-12-5.1 and 42 U.S.C. § 1983.

## DAMAGES

152.

As a direct, factual, and proximate result of Defendants' combined and concurring negligence, Plaintiff has incurred and will continue to incur significant medical expenses.

153.

As a direct, factual, and proximate result of Defendants' combined and concurring negligence, Plaintiff has suffered, and continues to suffer from severe and painful physical, mental, and emotional injuries.

154.

As a direct, factual, and proximate result of Defendants' combined and concurring negligence, Plaintiff sustained permanent physical injuries.

155.

As a result of the injuries the Plaintiff sustained as described herein, the Plaintiff has lost complete use of his left hand (amputation) and has lost the use of a significant part of his right hand.

156.

All of the injuries and damages claimed by Plaintiff directly resulted from Defendants' combined and concurrent negligence.

**WHEREFORE**, Plaintiff respectfully prays as follows:

(a) That this Complaint be filed and summonses be issued as provided by law;

(b) That Plaintiff be awarded damages;

(c) That Plaintiff be awarded attorney fees and other costs of litigation;

(d) That Plaintiff be awarded punitive damages;

(e) That all costs of this action be cast upon the Defendants; and

(f) That Plaintiff receive such other and further relief as the Court deems just and Proper.

Respectfully submitted this 5th day of March, 2026.

The Parker Firm, LLC
*/s/ Brian S. Parker*
Brian S. Parker

GA Bar No. 142228

Attorney for Plaintiff

1130 ARYA DRIVE
ROSWELL, GEORGIA 30076
Brian@tpfirm.com


/s/ Irwin M. Ellerin

Irwin M. Ellerin

Ga. Bar No.243750

Attorney for Plaintiff


ELLERIN LAW FIRM

1050 Crown Pointe Parkway Suite 410

Atlanta, Georgia 30338

imellerin@ellerinlaw.com

404.239.9100